**Entered on Docket**
**November 15, 2019**
**EDWARD J. EMMONS, CLERK**
**U.S. BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**



The following constitutes the order of the Court.
Signed: November 15, 2019

*M. Elaine Hammond*

_____
**M. Elaine Hammond**
**U.S. Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

| | |
|---|---|
| In re<br>Leeanna Dodson Martinez,<br><br>                          Debtor. | Case No. 18-51883 MEH<br><br>Chapter 13 |
| Naviscent, LLC,<br>                         Plaintiff.<br>v.<br><br>Michael Otte,<br>                       Defendant. | Adv. No. 18-5058 |
| Michael Otte,<br>                         Plaintiff.<br>v.<br><br>Naviscent, LLC and<br><br>Leanna Dodson Martinez,<br>                       Defendants. | Adv. No. 19-5014 |

<u>MEMORANDUM DECISION AFTER TRIAL</u>

1

Naviscent, LLC ("Naviscent") and Michael Otte ("Otte") each brought adversary proceedings against the other challenging the other creditor's claim amount and its secured status. The adversary proceedings were tried together on October 8 and 9, 2019. Following trial, the matters were taken under submission.

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B), (H), and (K).

Background:

Debtor Leeanna Martinez ("Martinez") provided bookkeeping services as an independent contractor since at least 2006 to several clients. She primarily worked from a home office rather than in her client's business space. Around March 27, 2018, Otte discovered that Martinez had been taking funds from his business, Otte Construction,[1] by use of an unauthorized credit card. He confronted Martinez with this information on March 28, 2018, at which time she did not deny the allegations and was concerned with whether Otte would file criminal charges. Otte requested additional information from Martinez in order to determine his losses. In addition, Otte promptly reached out to at least two other clients of Martinez to inform them of Martinez's actions.

Otte contacted Naviscent's president, George Papazian ("Papazian"). Naviscent began its own investigation and on April 10, 2018, Martinez and her husband met with Papazian, Naviscent's attorney, Bruce Prescott, and accountant, Christina Temple. At this meeting, Martinez admitted that she received unauthorized funds of Naviscent.

Otte and Naviscent each sought additional records from various financial institutions in order to determine the extent of their losses. In addition, each sought to improve the likelihood of their recovery by pursuing a secured claim. Naviscent did so by filing suit against Martinez on April 24, 2018, and requesting entry of a temporary restraining order and writ of attachment. Otte took a different path and entered into a Settlement Agreement and Mutual Release with Martinez on April 30, 2018 ("Settlement Agreement"), pursuant to which Martinez subsequently signed a Note and Deed of Trust ("DOT") on May 15, 2018.

[1] Otte and Otte Construction are referred to herein as "Otte."

2

The DOT was recorded on May 16, 2018. Otte and Naviscent now challenge each other's security interest and assert priority for their secured claim.

I.   Determination of Whether Each Claim is Secured:

A.   Whether Naviscent's Claim is Secured:

Naviscent asserts it has a secured claim based on the following:

- April 24, 2018 – Naviscent filed suit against Martinez in California Superior Court for the County of Santa Clara ("State Action").
  - With its complaint, Naviscent filed an *ex parte* application for a Right to Attach Order and Writ of Attachment ("Writ Application").
  - The court entered a temporary protective order ("TPO") but denied the Writ Application.
- The Writ Application was later converted to a Motion for Right to Attach Order and set for hearing on May 22, 2018.
  - By Minute Order on May 22, 2018, the court continued the hearing on the Writ Application to June 19, 2018 and extended the TPO until June 22, 2018.
  - In a further Order entered May 31, 2018, the court denied the Writ Application without prejudice, vacated the June 19 hearing date and reset the hearing for June 28, 2018. The court further extended the TPO through June 30, 2018.
- On June 28, 2018, the court issued a Right to Attach Order in favor of Naviscent. The Writ of Attachment ("Writ") was issued and recorded the following day.

Otte challenges the validity of the TPO and Writ on multiple grounds relating to the proceedings in the State Action. These arguments require an initial review of the *Rooker-Feldman* doctrine and the "law of the case" doctrine.

"The *Rooker-Feldman* doctrine is a well-established jurisdictional rule prohibiting federal courts from exercising appellate review over final state court judgments." *Reusser v.*

3

*Wachovia Bank, N.A.,* 525 F.3d 855, 858-9 (9th Cir. 2008).[2]  The "doctrine forbids a losing party in state court from filing suit in federal district court complaining of an injury caused by a state court judgment, and seeking federal court review and rejection of that judgment." *Bell v. City of Boise*, 709 F.3d 890, 897 (9th Cir. 2013).  A court must first "determine whether the action contains a forbidden de facto appeal of a state court decision." *Id.* (citing *Noel v. Hall*, 342 F.3d 1148, 1158 (9th Cir. 2003)).  "A de facto appeal exists when 'a federal plaintiff asserts as a legal wrong an allegedly erroneous decision by a state court, and seeks relief from a state court judgment based on that decision.' In contrast, if 'a federal plaintiff asserts as a legal wrong an allegedly illegal act or omission by an adverse party, *Rooker-Feldman* does not bar jurisdiction.'" *Id.* (quoting *Noel*, 342 F.3d at 1164).

The "law of the case" doctrine provides that a "court is generally precluded from reconsidering an issue that has already been decided by the same court, or a higher court in the identical case." *Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993).  In order to apply, "the issue in question must have been decided either expressly or by necessary implication in [the] previous disposition." *Id.* (internal quotation omitted).  In the bankruptcy context, "case" refers to the matter commenced by the filing of a petition, in addition to all adversary proceedings that arise within in it.  *Cohen v. Bucci*, 905 F.2d 1111, 1112 (7th Cir. 1990).  As such, law of the case doctrine "applies in adversary proceedings in a bankruptcy case, and even between separate adversary proceedings in the same bankruptcy case." *In re Pilgrim's Pride Corp.,* 442 B.R. 522, 530 (Bankr. N.D. Tex. 2010).  These adversary proceedings are just two of six adversary proceedings pending in Martinez's chapter 13 bankruptcy case.

Otte argues that Naviscent's Writ should be void based on the failure of Naviscent to post an undertaking as required by Cal. Civ. Proc. § 489.210.  This exact issue was addressed and decided in *Martinez v. Naviscent, LLC* (18-5071).  In that adversary, Martinez requested through summary judgment that the Writ and TPO be found void *ab inito* based on Naviscent's failure to post the undertaking.  After summary judgment was denied, Martinez

---

[2] The doctrine is based on two cases:  *Rooker v. Fid. Trust Co.,* 263 U.S. 413 (1923) and *D.C. Court of Appeals v. Feldman*, 460 U.S. 462 (1983).

4

brought a motion to alter or amend wherein the question was further considered. Otte was provided an opportunity to address the issue at that time but did not file a brief. This court's Order Denying Motion for Summary Judgment, Memorandum Decision re Motion to Alter or Amend Judgment, and Order on Motion to Alter or Amend Judgment are on appeal and pending before the District Court. Otte raises the same arguments as brought by Martinez in 18-5071.[3] As an allegedly illegal or improper omission by Naviscent, consideration of this question does not fall within the strictures of *Rooker-Feldman* doctrine. In addition, although appealable the Writ is not a final judgment. Cal. Civ. Proc. § 904.1(a)(5). However, the law of the case doctrine is on point. In order to preserve the integrity of proceedings and avoid the possibility of inconsistent rulings I am compelled to find the same result as before. Naviscent's failure to post an undertaking resulted in a voidable order, not an order that is void *ab initio*, for the reasons set forth more fully in the prior decision.

In addition, Otte asserts three arguments that were not raised previously. The questions are new and Otte was not a party to the pre-bankruptcy state court litigation. Hence, neither the *Rooker-Feldman* doctrine nor law of the case applies and these arguments may be addressed.

    1.  <u>Whether attachment could be issued against Martinez as a natural person?</u>

California Code of Civil Procedure § 483.010(c) limits attachment against a natural person. Where the defendant is a natural person the attachment may only be issued on "a claim which arises out of the conduct by the defendant of a trade, business, or profession."

---

[3] I note that Otte also raises Cal. Civ. Proc. § 484.110(a) which was not specifically addressed in the prior decision. This statute provides that the failure to oppose a writ of attachment and evidence provided in support of issuance of a writ is not a waiver of the ability to challenge any prior filings or evidence at trial. This is consistent with the findings in the Memorandum Decision re Motion to Alter or Amend Judgment. In her summary judgment motion Martinez objected to Naviscent's failure to post an undertaking – arguments that were never asserted during the process of obtaining the Writ. Martinez's failure to challenge the undertaking before the state court did not constitute a waiver of her ability to challenge the voidability of the TPO and Writ. 18-5071, Dkt. # 39, p. 10-11. There being no finding of waiver by Martinez, it follows that Otte could not have independently waived an argument in a state court action to which he was not a party.

5

As stated in the 1974 legislative comments of the California Senate, this statute continues the design of the prior statute "to limit attachment to cases arising out of commercial transactions." Subdivision (c) carries out this purpose by limiting attachment against an individual to a contract arising out of the conduct by the individual of a trade, business, or profession, and "only if the . . . services   . . . furnished were not used primarily for the defendant's personal, family, or household purposes." *See also Kadison, Pfaelzer, Woodard, Quinn & Rossi v.* Wilson, 197 Cal. App. 3d 1, 4 (Ct. App. 1987) (limiting use of attachments to "commercial transactions" and precluding them in "consumer transactions"). Martinez conducted business as a bookkeeper and Naviscent's claims arose out of this commercial transaction. The bookkeeping services that Martinez furnished were for her client's business and financial operations – not her personal, family, or household purposes. Otte provides no case law for his contention that how a defendant uses allegedly ill-gotten gains restricts when attachment is allowed.

> 2. <u>Whether Naviscent properly extended the TPO?</u>

Otte challenges whether Naviscent's Writ may relate back to issuance of the TPO on April 24, 2018.[4] Naviscent bears the burden of establishing the validity of its lien.

Naviscent relies upon Cal. Civ. Proc. § 484.080 to support its contention that the TPO was validly extended by the court in the State Action at continued hearings on its application for a right to attach order, held on May 22 and May 31, 2018.

Otte asserts that Naviscent's TPO expired 40 days after issuance, pursuant to Cal. Civ. Proc. § 486.090,[5] and was not properly extended beyond this expiration date and any further protective order required a formal, noticed motion which Naviscent did not file. However, Civ. Proc. § 486.090 provides that the TPO will expire at the earliest of 40 days after

---

[4] This is the first time this question is properly before the court. In *Martinez v. Navsicent*, 18-5071, Martinez raised this issue in her Motion to Alter or Amend Judgment (Dkt. #34, p. 23-25). New legal theories are not properly considered for the first time on motion to amend. *In re JSJF Corp.*, 344 B.R. 94, 103 (9th Cir. BAP 2006), *aff'd and remanded*, 277 Fed. Appx. 718 (9th Cir. 2008).

[5] Improperly referenced as Cal. Civ. Proc. § 489.090 (repealed and replaced in 1982).

6

issuance, an earlier date prescribed by the court, or when a levy attaches *except as otherwise provided in this title*. Title 6.5 on Attachment includes Civ. Proc. § 484.080. In his trial brief, Otte recognizes that § 484.080(a) authorizes the court to grant the plaintiff a continuance, as well as extend the effective period of any protective order for a period not more than 10 days after the new hearing date if the plaintiff shows a continuing need for the protective order. But his analysis focuses solely on the burden placed upon a plaintiff to either bring a noticed motion for extension or comply with the showing required by § 484.080(a).

Otte's argument is misdirected. The uncontroverted evidence at trial is that at both the May 22 and May 31, 2018 hearings the continuances granted by the court were requested by the attorney appearing on behalf of defendant Martinez. Based on this factual finding, § 484.080(b) applies. Section (b) authorizes the court to grant the defendant a continuance for a reasonable period to oppose the issuance of the right to attach order. If a continuance is granted, the court *shall extend* the protective order for a period ending not more than 10 days after the new hearing date unless the defendant shows otherwise. The extensions provided on May 22 and 31 comply with the time restrictions of § 484.080(b).

As such, I find Naviscent's reliance on § 484.080(b) appropriate. Otte has not established that the State Court's extensions exceeded statutory authority such that the TPO had expired at the time of issuance of the Writ.

### 3. Whether this Court Corrected Naviscent's Writ?

Otte argues that this court exceeded its jurisdiction and has in some manner "correct[ed] erroneous rulings by the judge in the State Court Judge and Naviscent's patent negligence in the State Court Action." Dkt. # 67, p. 17, l. 14-15. The means by which this court has taken such action is unclear. Otte appears to misinterpret the result of prior decisions. Naviscent's Writ remains exactly as it was on the Petition Date.

In sum, Naviscent established that in the pre-petition state court proceedings it obtained the TPO, followed by the Writ. The Writ was recorded on June 29, 2018. The Writ was properly issued against Martinez, a natural person. Her conduct while engaged in providing business services for Naviscent is the source for Naviscent's underlying claim.

7

Further, the TPO was properly extended by the state court through issuance of the Writ. Although Naviscent's Writ is a voidable order, it has not been avoided or otherwise determined to be invalid, and as such, Naviscent's claim is secured in accordance with the Writ.

B. Whether Otte's Claim is secured or should be disallowed?

Naviscent seeks to avoid Otte's claim, in whole or in part, through state law claims made applicable by Bankruptcy Code[6] § 544. Section 544 authorizes a chapter 13 trustee to avoid a transfer of interest of the debtor in property or obligation incurred by the debtor, to the extent that it is avoidable under applicable law by a creditor holding an allowable unsecured claim. 5 Collier on Bankruptcy ¶ 544.06[1] (Richard Levin & Henry J. Sommer eds., 16th ed.) Here, the Chapter 13 Trustee and Naviscent stipulated to Naviscent's pursuit of "causes of action under Bankruptcy Code section 544, 548, 550 and California Code of Civil Procedure 3439 for intentional and constructively fraudulent transfers." (Dkt. 18-51883, Stipulation #66, Motion #71) Claims filed by the IRS, and for credit card obligations by Nordstrom Inc. and Bank of America establish the existence of a creditor holding an allowable unsecured claim.

1. Whether actual fraud applies?

Naviscent requests that Otte's lien be avoided on the basis of actual fraud, pursuant to Cal. Civ. § 3439.04(a)(1), made applicable by Bankruptcy Code § 544. In order to prevail on this claim, Naviscent must establish by a preponderance of the evidence that the transfer was made with actual intent to hinder, to delay, or to defraud a creditor. "Any of the three – intent to hinder, intent to delay, or intent to defraud—qualifies a transfer for UFTA avoidance." *Wolkowitz v. Beverly (In re Beverly)*, 374 B.R. 221, 235 (9th Cir. BAP 2007). "The focus is on the intent of the transferor" and is a question of fact determined by a preponderance of the evidence. *Id.*

---

[6] 11 U.S.C. §§ 105 *et seq.*, referred to herein as the "Bankruptcy Code."

8

*Intent to defraud*:

Otte credibly testified that his primary objective was in getting paid (or made whole) as quickly as possible. He was not interested in pursuing criminal charges against Martinez because it was not likely to result in prompt repayment. While Martinez did not provide additional testimony on this issue, the text messages between Otte and Martinez do not evidence an intent to further defraud Naviscent by either Otte or Martinez.

*Intent to hinder or intent to delay*:

Martinez's actions regarding an intent to delay or hinder cannot be viewed so charitably. After fraudulently obtaining funds from several clients over multiple years, her actions had now been revealed. Otte discovered her misuse of Otte Construction funds. He confronted Martinez and promptly shared this information with her other clients. Otte's focus was on repayment and moving forward. In contrast, Papazian was not interested in a settlement agreement that limited Naviscent's options, including criminal proceedings, and promptly brought the State Action seeking recovery.

Several themes emerge from the text messages and emails sent by Martinez:

- She continuously underestimated the amount of funds she had taken from Otte and Naviscent through the years.

- Having reached agreements with Otte and Mark Smith, Martinez believed Naviscent should also agree to a settlement. Papazian's refusal angered and depressed her.

- To Martinez, Naviscent's filing of the state court suit was an unreasonable and unwarranted response designed to harm her – or because of which she would harm herself.

- To Martinez, Otte was the "good," sympathetic person who deserved to receive the available funds first. In return, Otte was moderately sympathetic and willing to treat Martinez kindly in order to further his interest of being repaid promptly.

Martinez preferred that Otte receive any available money before Naviscent. She took numerous actions to further this result.

9

Shortly after receiving notice that Naviscent filed suit against Martinez, she:

- Texted Otte that she would tell Papazian that she had signed an agreement with Otte. (N-55, 4/27/2018)

- Emailed Papazian that she had already signed an agreement with Otte and that he was in line to be paid first. (N-25, 4/27/2018)

Three days later she signed a Settlement Agreement with Otte. (N-55, 4/30/2018)

Hours after signing the Settlement Agreement Martinez was served with the Naviscent complaint. (N-55, 4/30/2018) She promptly notified Otte and informed him that he was in the complaint as well. (N-55, 4/30/2018) Five minutes after the text was sent, Otte called Martinez and they talked for 14 minutes.

Prior to signing the Note and DOT, Martinez informed Otte through separate texts that as a result of the suit, she could not sell the house or even list it for sale. (N-55, 4/28/2018, 5/14/2018) Martinez also knew that her plan of selling the house and paying everyone would not work. ("Rene said there isn't Enough money to pay every one and no one will purchase with a short sale." N-55, 5/14/2018) The Note and DOT were signed on May 15, 2018.

After the Note and DOT were signed, Martinez continued to take action to hinder Naviscent's recovery:

- "Now he's really going to have to work to get his money. I'm signing legal separation papers today so Rene is protected. My estate will have to go through probate. It will be months or more before the house can even be sold. It may go into foreclosure first. He is the one who will be royally screwed." (N-55, 5/18/2018)

Through Otte's sympathy for Martinez, a special relationship was continued or created between them. Otte encouraged Martinez to stand up to Papazian, reminded her that no one wanted to see her harm herself, and provided the prospect of a resolution palatable to Martinez – the sale of her home to satisfy debts, and walking away without any further repercussions.

Case: 19-05014   Doc# 37   Filed: 11/15/19   Entered: 11/15/19 13:02:55   Page 10 of 23

I find that at least three badges of fraud are present: transfers through the Settlement Agreement, Note and DOT followed the filing of a suit by Naviscent (the less preferred creditor), a special relationship between debtor and Otte (the preferred creditor), and as her former clients researched their claims, Martinez faced a growing and unmanageable insolvency.

As such, Martinez's grant of a security interest to Otte in the form of a Note and DOT with knowledge of the state court litigation (specifically, the TPO and pending writ) was done with the intent to hinder and intent to delay the assertion of a secured claim by Naviscent. As such, Otte's secured lien is avoided pursuant to § 544. Otte's underlying claim is based on actions distinct from this actual fraud based upon an intent to hinder or to delay. As such, the lien is avoided but Otte's claim is allowed as a general unsecured claim.

2. <u>Whether constructive fraud applies?</u>

Naviscent sought to avoid Otte's claim or lien on the basis that pursuant to Cal. Civ. § 3439.04 the Settlement Agreement, Note, and Deed of Trust resulted in a constructively fraudulent transfer. Naviscent bears the initial burden of establishing by a preponderance of the evidence that Martinez did not receive reasonably equivalent value for the secured claim she granted Otte, and that she was insolvent or rendered insolvent at the time of the transaction.

This argument requires a finding that Otte's actual claim is significantly less than the $300,000 note signed on May 15, 2018. As discussed below, I find the evidence sufficient to allow Otte's claim in the amount filed of $303,000. Thus, Naviscent has not met its initial burden on this point.

As to Martinez's insolvency, the lien placed against her home by Otte did not extinguish the equity in her property. As such, she was not rendered insolvent by the transfer. Viewed more broadly, as claims stemming from her embezzlement have developed, Martinez is now insolvent as a result of her own actions, not those of her creditors.

3. <u>Whether equitable defenses apply?</u>

Naviscent asserts that its challenge pursuant to § 544 of Otte's claim may be supplemented by the equitable defenses of unclean hands and unjust enrichment.

The doctrine of unclean hands requires that a party seeking relief "shall have acted fairly and without fraud or deceit as to the controversy in issue." *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1097 (9th Cir. 1985). As discussed below, I do not find that Otte fraudulently calculated his claim. There are no allegations that Otte made fraudulent misrepresentations to Naviscent or any other party regarding his claim or its priority. Therefore, unclean hands does not apply.

Naviscent's argument that unjust enrichment should apply is invalidated by allowance of Otte's claim in the asserted amount, discussed below.

4. <u>Whether the Settlement Agreement, Note and DOT are enforceable?</u>

Naviscent asserts that the Settlement Agreement is an illegal contract to abstain from prosecuting a crime and can be avoided under § 544(b). I need not reach the merits of this allegation, as Naviscent fails to satisfy two requirements.

First, Naviscent has not established that it has standing to avoid a claim on this basis pursuant to § 544(b) on behalf of the estate. The stipulation entered into by Naviscent and the Chapter 13 Trustee authorized Naviscent to pursue "intentional and constructively fraudulent transfers" on behalf of the estate. This is neither.

Second, Naviscent has not established the existence on the petition date of an unsecured creditor with an allowable claim who may avoid this contract under state law. Naviscent asserts it raised this claim through its first cause of action seeking declaratory relief and its seventh affirmative defense to Otte's complaint. Neither of these sections identifies a creditor meeting the statutory requirements.[7] Further, it is not clear that any unsecured creditor would have had standing to avoid the Settlement Agreement, Note or DOT on the

---

[7] In its Second and Third Causes of Action Naviscent provided a general statement that at least one or more creditors holding unsecured claims against Martinez could avoid the actual or constructively fraudulent transfers.

12

basis that it was illegal or void. Cases addressing the illegality of such contracts involve a suit by one party to the agreement seeking to enforce the contract against the other with the respondent defending on the basis that the agreement was illegal and void, for example *Bowyer v. Burgess*, 54 Cal. 2d 97 (1960); *Ogden v. Ford*, 179 Cal. 243 (1918); *Thom v. Stewart*, 162 Cal. 413 (1912) (action to enforce promissory note by assignee). Courts have recognized the general rule that "equity will not aid one party or another to an illegal transaction where they stand in pari delicto, but will leave them just where it finds them, to settle these questions without the aid of the court. This rule is universally recognized." *Colby v. Title Ins. & Trust Co.,* 160 Cal. 632, 640 (1911) (citations omitted). All of the cases cited by Naviscent or reviewed by the court provide for relief to contracting parties or their assignees. No authority has been identified for a non-party unsecured creditor to avoid an illegal contract.

In summation, I find that Otte has an allowed unsecured claim. The securitization of Otte's claim through the Note and DOT was undertaken by Martinez with an actual intent to hinder or intent to delay Naviscent. As such, pursuant to § 544(b), Otte's security interest is avoided and the claim is unsecured. The remainder of Naviscent's grounds to avoid Otte's security interest are without merit.

II.      Determination of allowed claim amounts:

A.      Naviscent's Claim

Naviscent requests approval of its third amended proof of claim (Claim #8-3) filed June 21, 2019, in the amount of $1,830,012.50. Naviscent's claim states it is based on "Fraud, embezzlement, conversion, breach of fiduciary duty, PC 496." "PC 496" refers to California Penal Code § 496 which allows an injured person to bring a civil action against someone who receives property obtained in a matter constituting theft or extortion. Theft in the context of this statute includes theft committed by means of embezzlement.

Per the specification of damages, the claim consists of five components:

-      Embezzled funds - $734,000

-      Interest on embezzled funds through October 31, 2018 - $513,800

13

- Attorney's fees and costs expended to date recovering converted property - $350,000

- Time by Plaintiff expended to date recovering converted property - $225,000

- Accounting fees expended to date recovering converted property - $7,212.50

1. Embezzled Funds:

Otte's first concern is that the amount of embezzled funds increased significantly during the course of this bankruptcy case. The following table reflects changes in Naviscent's statement of embezzled funds:

| Date | Amount | Event |
|------|--------|-------|
| April 10, 2018 | $82,000 | Initial meeting between Martinez and Naviscent representatives |
| April 23, 2018 | $285,000 | Amount stated in State Action complaint and TPO request |
| April 30, 2018 | $282,000 | Analysis provided by Christina Temple |
| October 9, 2018 | $279,919 | Initial POC[8] filed by Naviscent |
| June 21, 2019 | $734,000 | Amended POC filed by Naviscent |
| July 31, 2019 | $842,359 | Medina Consulting expert report, prepared for trial |

The most significant increase occurred during the eight month period between the filing of Naviscent's initial and amended proofs of claim. Papazian testified this increase is the result of his continued inquiry and demands to Naviscent's financial institutions to produce additional records – in particular, records more than seven years old. Papazian's testimony regarding the difficulty and diligence required to obtain earlier bank records is credible and consistent with Otte's testimony as to the difficulty he encountered in obtaining bank records. So, the mere fact that the base claim amount increased does not warrant a reduction of the claim.

---

[8] Proof of claim

14

As explained at trial, Naviscent's claim for embezzled funds arose from Martinez's actions in three areas: (1) Purchase of personal items using an ATM card for Naviscent's business account, (2) Cash withdrawals made from the business bank account, and (3) Submission of excess hours for work performed as bookkeeper. Richard Medina, Naviscent's expert, provided testimony on how the funds were removed and the losses hidden. In essence, Martinez altered financial records by deleting or altering sales invoices, related receipts, and customer payments from the QuickBooks accounting records. These changes created a pool of funds that could be taken without being reflected in the on-going business reports. Medina identified a total of $801,210 in deleted or altered sales invoices. This calculation of the pool of funds created is supported by his identification of $453,374 in deleted deposits from Naviscent's QuickBooks and $381,250 in cash withdrawals from Naviscent's bank account. Other than transfer of funds between Naviscent accounts, there was no business purpose for cash withdrawals.

In addition, Medina identified $41,149 in excess earnings paid to Martinez through ADP in 2017 and 2018 based on payments made during prior years.

*Large cash withdrawals*:

At trial, Otte addressed whether three large cash withdrawals in February and March 2007 should be included in the calculation of embezzled funds. The withdrawals at issue are:

- $175,000 withdrawn on February 7, 2007

- $125,000 withdrawn on February 20, 2007

- $100,000 withdrawn on March 21, 2007

These withdrawals were significantly larger than other withdrawals attributed to Martinez and Otte challenged whether they should be included in Naviscent's losses. At trial, Medina clarified that the February 7 and 20 withdrawals were not included in his calculation of losses. For each of these withdrawals, the exact amount of funds withdrawn from Wells Fargo was deposited on the same day into a Naviscent account at Bank of America. The third withdrawal from Wells Fargo on March 21 was preceded by a deposit into Bank of America four days *earlier*. Because the deposit did not occur the same day, it was included in the

15

calculation of unauthorized cash withdrawals. To be sure, questions remain as to the exact nature of this transaction. But Medina's calculation of loss is based on the deleted or altered sale information—unauthorized cash withdrawals and deleted deposits provide a check against this calculation of loss, not an increase to it. Further, as the proof of claim amount is approximately $108,000 less than Medina's calculated loss, any questions are resolved by allowance of embezzled funds in the amount stated in the proof of claim.

*ATM Cards*:

In her initial meeting with Papazian, Martinez admitted to using an ATM card associated with Naviscent's business accounts for unauthorized cash withdrawals and debit purchases for her benefit. Papazian testified that over the course of Naviscent's existence, ATM cards were issued to himself, a former business partner, and Martinez. He also testified that he had never used his card and at least one card issued to him was never activated it. Finally, he testified that his former business partner may have used the ATM card a couple times between 2006 and 2010.

Initial analysis provided by account Christina Temple identified $275,257.61 in unauthorized cash withdrawals or purchases with ATM cards, plus an additional $44,638.34 that needed further verification. Medina identified $381,250 in unauthorized bank withdrawals in cash or through purchases.

Otte challenges whether Martinez was responsible for all the cash withdrawals and purchases as Naviscent received multiple ATM cards for the Wells Fargo account through the years. Specifically, notices produced indicated that an ATM card was received in 2010 and two cards were received in 2014. Otte's position appears to be that because there were multiple cards, other individuals could have made the withdrawals or purchases. While possible, the only evidence provided at trial was that Martinez, Papazian, and a former business partner had ATM cards. Papazian testified that he never used the ATM card issued for him. The business partner left in 2010, thus, he would not be responsible for any withdrawals or purchases after that time. The only remaining individual with an ATM card was Martinez, who admitted to using an ATM card for personal purchases. There is no

16

evidence to support that Papazian made debit purchases for groceries or scrapbook supplies on the business account. Further, the issuance of cards four years apart indicates a replacement card was issued by the bank rather than additional cards were issued to unidentified holders.

Thus, Naviscent's claim for embezzled funds as stated in the amended POC is allowed in the amount of $734,000.

2. <u>Interest</u>

Naviscent includes $513,800 in estimated interest calculated at the rate of 7% in its claim. Otte disputes that Naviscent is entitled to pre- or post-judgment interest because it has not established that interest is available for this type of claim. California law recognizes a right to interest on a claim based on an implied contract. California Civil Code § 3287(a) provides that if an entity is entitled to recover damages certain, and the right to recover is vested in the person upon a particular day, that person is also entitled to recover interest from that day, except when prevented by law. If interest is not specified in the contract the contract rate is the legal rate. Application of pre-judgment interest was found to be consistent with the attachment statutes in *In re Ryan*, 369 B.R. 536, 548-49 (N.D. Cal. 2007) (referencing Cal. Civ. Proc. § 483.015(a)(1)).

Additionally, California Civil Code § 3336 provides for calculation of damages based upon conversion. The statute authorizes damages for the value of property at the time taken, with interest from that time.

Accrual of interest post-petition is limited by Bankruptcy Code § 506(b). Post-petition interest is only authorized up to the amount by which a secured claim is oversecured. As the proceeds from the sale of Martinez's home are less than the allowed amount of Naviscent's claim, the accrual of interest is capped as of the Petition Date.

3. <u>Attorney's Fees:</u>

California Civil Procedure Code § 482.110 authorizes a party seeking attachment to include an estimate of costs and allowable attorney's fees, and the court in its discretion may include this in the amount to be secured by the attachment. *See also* Civ. Proc.

17

§ 483.015(a)(2) (authorizing amounts included by the court pursuant to § 482.110 in the attachment). However, as stated in the 1976 committee reports: "This section does not provide any authority for the award of costs or attorney's fees not otherwise made recoverable by contract or statute." 13 Cal. L. Rev. Comm. Reports 801, amended by 16 Cal. L. Rev. Comm. Reports 1625. Here, the contract is implied, so in order for attorney's fees to be allowed, Naviscent must establish a statutory basis for attorney's fees.

Naviscent first looks to the authorization of damages for conversion provided in Civ. § 3336. It authorizes damages for the value of property at the time taken, with interest from that time, plus "fair compensation for the time and money properly expended in pursuit of the property." Yet, this language does not expressly provide for attorney's fees and California courts have long held that they are not authorized by this section. *Haines v. Parra*, 193 Cal. App. 3d 1553, 1558-59 (Ct. App. 1987). Expenses "incurred in preparation for litigation and not in pursuit of property" cannot be allowed as damages under Civil Code § 3336." *Security-First National Bank of Los Angeles v. Lutz*, 322 F.2d 348, 352 (9th Cir. 1963). As one court theorized, when "§ 3336 was enacted in 1872, the Legislature may have contemplated compensation for time spent searching the countryside in search of misappropriated livestock or other chattels. But [Plaintiff] could only rely on legal process to recover the property that [Defendants] withheld." *Gladstone v. Hillel,* 203 Cal. App. 3d 977 (Ct. App. 1988). Here, Naviscent may only rely on legal process to recover funds, and attorneys' fees incurred in relation to litigation are not authorized by § 3336.

Next, Naviscent offers Penal Code § 496(c), which provides an additional right to recover through a civil cause of action for parties injured by another's receipt of stolen property as defined in § 496(a). "Theft" has the same meaning as provided in the general theft statute, Penal Code § 484, and thus includes theft committed by means of larceny, embezzlement, or false pretenses. *See People v. Allen*, 21 Cal. 4th 846, 863 (1999). Section 496(c) authorizes a person injured in accordance with this statute to bring an action for three times the amount of actual damages sustained, costs of suit, and reasonable attorney's fees. Courts have held that money can be taken and withheld by the same person for purposes of

18

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

this section. However, in order for § 496(c) to apply to the person responsible for taking the funds, the victim must request recovery of the funds before making their claim. *See Bell v. Feibush,* 212 Cal. App. 4th 1041, 1047 (Ct. App. 2013); *see also* Douglas Hume, Recent Developments Regarding Penal Code Section 496, 42 Oct. L.A. Law. 12 (2019).

Naviscent's state court complaint against Martinez included a claim based on Penal Code § 496. The requirements of a claim pursuant to this section are satisfied: (1) money was stolen from Naviscent in a manner constituting theft, (2) Martinez knew the funds were stolen, (3) Martinez knew she possessed stolen funds, and (4) Naviscent requested that Martinez return the money before bringing the state court action. This fourth factor is satisfied through settlement discussions between Naviscent and Martinez, through their counsel. Each party provided a form of settlement agreement to the other but, ultimately, no agreement was signed and no funds repaid.

Accordingly, Naviscent established a statutory basis to include attorney's fees in its allowed claim, subject to further determination of reasonableness. However, as Naviscent's allowed claim exceeds the proceeds from the sale of Martinez's home, whether the return on investment warrants additional briefing on this basis is a separate question.

4. Naviscent's fees incurred

Naviscent's claim includes $7,212.50 for accounting fees and $225,000 for Naviscent's time expended recovering converted property. Papazian testified that he spent extensive periods of time seeking information, reviewing financial records, and analyzing the loss to his company. He asserts that he spent in excess of 730 hours on this. The claim for his time equates to 600 hours at his business billing rate of $375 per hour.

As discussed, Naviscent supports its claim for damages by reference to two statutes – neither of which provide for this form of damages. Civil Code § 3336's authorization for "time and money expended in pursuit of the property" does not include costs in pursuit of litigation. Litigation is the only means of recovery and was on-going during most of Papazian's research. Penal Code § 496 is no more helpful to Naviscent as the fees incurred

Case: 19-05014    Doc# 37    Filed: 11/15/19    Entered: 11/15/19 13:02:55    Page 19 of 23

are neither actual damages or costs of suit. As such, the $232,212.50 claimed for Naviscent's fees incurred is disallowed.

B. <u>Otte's Claim Amount</u>

Otte seeks approval of his claim filed in the amount of $303,711.78. Like Naviscent's, Otte's claim is composed of multiple parts:

- Principal amount owed on promissory note ($300,000)
- Interest accrued through Petition Date at 2.18% per annum ($1,881.37)
- Interest accrued from Petition Date to 9/6/18 (pre-default) at 2.18% per annum ($268.77)
- Interest accrued from 9/6/18 to 9/25/18 at 10% default interest rate ($1,561.64)

Otte's claim is based upon a Settlement Agreement and Mutual Release, a Note and DOT. As addressed previously, the Note and DOT are avoided by this decision based upon Martinez's intent to hinder and delay Naviscent. As a result, Otte's claim is now framed by the terms of the Settlement Agreement. The Settlement Agreement resolves Otte's claim against Martinez for $300,000, with no provision for interest. Therefore, Otte's claim is reduced by $3,711.78 for interest asserted and disallowed.

The Settlement Agreement is based upon losses sustained by Otte as a result of Martinez's malfeasance while providing bookkeeping services. Naviscent asserts that the Settlement Agreement amount of $300,000 overstates Otte's losses. Otte provided support for the claim in a spreadsheet incorporating losses for (1) fraudulent credit card expenditures, (2) payments to unrelated and unauthorized credit cards, and (3) unauthorized checks payable to Martinez.

1. <u>Fraudulent credit card expenditures</u>

As early as 2011, Martinez obtained a Capital One credit card in her name for the Otte Construction account. Otte did not consent to issuance of this card and was unaware of it until he discovered the fraud in 2018. The claim includes $48,788.77 for charges to the card in Martinez's name. Naviscent challenges the inclusion of numerous charges in Otte's claim

on the basis that statements indicate that Otte or Otte Construction may have benefited from some or all of the payments. This argument is not supported by California law.

As with Naviscent's claim, under California law embezzlement is a criminal claim. Civil claims for recovery based on embezzlement are pursued on the basis of conversion. Civil Code § 3336 provides that damages for conversion include the value of the property at the time of conversion, with interest from that time, and fair compensation for the time and money expended in pursuit of the property. Civil Code § 3337 further states that the presumption set forth in § 3336 "cannot be repelled, in favor of one whose possession was wrongful from the beginning, by [her] subsequent application of the property to the benefit of the owner, without his consent." California courts have applied the statute consistent with its language. *See Acme Paper Co.*, 125 Cal. App. 2d at 181 (finding that where a harmed party did not consent to purchases or from a hidden entity, it was unnecessary to determine whether merchandise was ultimately received by the harmed party); *see also Camp v. Ortega,* 209 Cal. App. 2d 275, 286-88 (Cal. Ct. App. 1962) (finding that the trial court erred in deducting the amount of a lien on converted assets in determining damages). Otte's claim is against Martinez. As such, it is appropriate for Otte to include amounts appropriated without consent, even if the charges or related payments subsequently benefitted Otte.

2. Unauthorized checks payable to Martinez

At trial, testimony indicated that Otte's claim included all payments to Martinez as unauthorized. This is not consistent with the summary of funds prepared in support of Otte's claim as it asserts a total of $20,049.91 on this basis over a five year period. The checks identified are not regular and may only occur two or three times a year. As such, the evidence provided does not indicate that the unauthorized checks were payment for authorized bookkeeping services. No adjustment is required on this basis.

3. Difference between financial summary and Settlement Agreement:

The financial summary supporting Otte's claim for damages identifies $244,746.25 in fraudulent expenditures and unauthorized payments. The Settlement Agreement is in the amount of $300,000. Naviscent argues this amount is overstated. Otte testified that he was

21

unable to obtain bank statements prior to 2009 and credit card statements prior to 2013. Evidence was submitted that Martinez obtained a credit card in her name as early as 2011. Katie Fuller, a CPA that reviewed Otte's financial summary, stated that a review of the financial records established that Martinez was consistently taking around $5,000 per month. If Martinez began taking these funds in October 2011, when she obtained a card in her name, then at the rate of $5,000 per month, she misappropriated approximately $75,000 more than accounted for in the financial summary. This amount would exceed the $300,000 stated plus the $34,500 previously received, thus the $300,000 Settlement Agreement is an allowed claim for Otte's losses.

Conclusion

Naviscent established an allowed, secured claim in the amount of $734,000, plus interest through the Petition Date, and reasonable attorney's fees in an amount to be determined.

Otte established an allowed, secured claim in the amount of $300,000. However, his security interest was voided through Martinez's actual intent to hinder or delay Naviscent's recovery. As a result, Otte's claim is a non-priority unsecured claim.

A post-trial conference is set in these proceedings for December 16, 2019, at 10:00 a.m.

**END OF MEMORANDUM DECISION**

UNITED STATES BANKRUPTCY COURT
for the Northern District of California

1

## COURT SERVICE LIST

2 All ECF Recipients

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

23